948 F.2d 507
 Fed. Sec. L. Rep. P 96,211
In re CONVERGENT TECHNOLOGIES SECURITIES LITIGATION.
Robert MORRIS, on behalf of himself and all others similarly
situated, Plaintiffs-Appellants,
v.
Merrill E. NEWMAN, et al., Defendants-Appellees.
 No. 90-15156.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1991.
Decided Aug. 27, 1991.
As Amended on Denial of Rehearing and Rehearing En Banc Dec. 6, 1991.
 
 Melvyn I. Weiss, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for appellants.
 Steven M. Schatz and Terry T. Johnson, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., Michael F. Perlis, Stroock & Stroock & Lavan, Los Angeles, Cal., Philip F. Atkins-Pattenson, Pettit & Martin, San Francisco, Cal., for appellees.
 Walter J. Robinson, Pilsbury, Madison, and Sutro, San Francisco, Cal., for underwriter appellees.
 Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for outside director appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before FLETCHER, THOMPSON and O'SCANNLAIN, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Purchasers of the stock of Convergent Technologies, Inc. ("Convergent") brought this class action against Convergent and certain of Convergent's officers and directors, the underwriters of public offerings of Convergent stock, and Unysis Corporation (formerly known and hereafter referred to as "Burroughs") (collectively "defendants"). The plaintiffs represent a class of all those who bought Convergent stock between a March 17, 1983 public stock offering, and February 17, 1984, the day after Convergent disclosed negative information to a group of stock analysts (the "class period").
 
 
 2
 The plaintiffs asserted causes of action under section 11 of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934, and California law. The complaint alleged the defendants misrepresented the growth in demand for Convergent's existing line of computer workstation products and concealed allegedly severe production and profitability problems with two product lines under development during the class period. It also charged that the underwriter defendants' research reports contained misrepresentations.
 
 
 3
 In November 1986, the district court dismissed the plaintiffs' section 11 claims on the ground that the plaintiffs instituted their suit more than one year after they were on inquiry notice that a potential section 11 claim existed. Two years later, the district court dismissed the rest of the claims. The court determined that the plaintiffs had not produced sufficient evidence to support their contention that the defendants' public statements were misleading, or that the defendants had failed to disclose any material facts. The district court also granted summary judgment in favor of the underwriter defendants, concluding that their research reports had "a sufficient factual and/or historical basis." See In re Convergent Technologies Sec. Litig., 721 F.Supp. 1133 (N.D.Cal.1988).
 
 
 4
 The plaintiffs appeal from the district court's grant of summary judgment on all claims. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
 
 FACTS
 
 5
 The plaintiffs construct their case on the foundation of alleged misleading statements and omissions relating to three discrete Convergent product lines.
 
 A. The AWS/IWS Product Line
 
 6
 In early 1981, Convergent began shipping its first product, a sixteen-bit microprocessor-based workstation, called the IWS. Convergent later developed a lower-cost version called the AWS. In 1982, the AWS/IWS workstation was Convergent's only product. Convergent sold the AWS/IWS product line to Original Equipment Manufacturers ("OEMs") such as Burroughs and NCR, who then integrated the products into their own product lines under their own labels. Convergent sold its products pursuant to signed purchase agreements.
 
 
 7
 In September 1981, Convergent and Burroughs entered into a master Corporate Pricing Agreement (the "Agreement"). The Agreement required Burroughs to buy 10,000 workstations by the end of 1983. In July 1982, Burroughs and Convergent began negotiations regarding future Burroughs' purchases. In a letter dated July 29, 1982, Convergent agreed to reduce prices on its AWS/IWS workstations by 30% in return for Burroughs' "firm commitment" to buy 30,000 units from Convergent in 1983. Convergent never disclosed this 30,000 unit figure to the public.
 
 
 8
 In December 1982, Convergent and Burroughs began renegotiating the quantity commitment and exploring the possibility of a further price cut. By March 17, 1983, when the class period commenced, Burroughs had bought more than the 10,000 workstations it had committed to buy in the Agreement. Just after that date, Burroughs informed Convergent that it would buy 17,500 AWS workstations, plus all the NGENs (a new product line we discuss in part B) Convergent could make. The parties incorporated these quantities into an amendment to the Agreement. They signed the Amendment in September of 1983.
 
 
 9
 Sometime toward the end of July 1983, Convergent management concluded that AWS/IWS sales growth during the remainder of the year would slow. Convergent disclosed this projection in a press release on August 5, 1983:[N]et sales for the third quarter of 1983 will be approximately equal to [Convergent's] net sales for the second quarter because of customer anticipation of [Convergent's] next generation of products, which are expected to be available for volume shipments in the first half of calendar 1984. Fourth quarter revenues cannot be predicted with certainty, but could be below third quarter revenues. Because of price reduction on existing products and start-up costs associated with three new product lines, the Company anticipates that until volume shipments of its new products begin there will be a decrease in gross profit margin, and may be a substantial decrease in net income.
 
 
 10
 As a result of this press release, the stock price dropped $6.63 a share, nearly 20%.
 
 B. The NGEN Product Line
 
 11
 As early as 1982 Convergent began finalizing development plans on the successor to the AWS/IWS workstation. Convergent expected the NGEN workstation (short for "Next GENeration") to cost approximately half as much as the AWS/IWS with significant improvements in performance. Convergent established target list prices for the NGEN product line in the summer of 1982. It began to negotiate contracts for the sale of NGEN to its OEM customers, including Burroughs, by late 1982.
 
 
 12
 In early 1983, Convergent management became aware of serious pricing and cost problems with the NGEN line. In February, the NGEN project director noted in an internal memorandum that the cost/pricing structure for NGEN would leave the company "with no profit!" The project director concluded that he did not yet "know how to achieve" the necessary reductions. He anguished: "I need more ideas." In late March, he circulated another internal memo, using a best-case analysis that revealed negative gross margins on sales to Burroughs through 1983.[1]
 
 
 13
 In its March 17, 1983 Prospectus, Convergent discussed the introduction of the NGEN line and Convergent's cost objectives:
 
 
 14
 The Company plans to introduce an advanced family of 16-bit workstations which will be software compatible with its existing product line, but which are intended to provide significant performance and price advantages.... Volume shipments of these new products are planned for 1984; consequently, they are not expected to have a significant impact on 1983 revenues....
 
 
 15
 In addition to its current products, this division is developing an advanced family of 16-bit multifunction workstations which the Company anticipates will be both significantly more powerful and less expensive than existing workstation products. These workstations will be software compatible with the AWS and IWS products. The Company currently expects to introduce and to begin volume shipments of these products in the first half of 1984. While the Company believes that the technical risks in the development of these products are well controlled, the product cost objectives are very aggressive, and there is no assurance that they can be achieved.
 
 
 16
 As it turned out, for most configurations of the NGEN workstation, Convergent failed to achieve positive gross margins until 1984.
 
 
 17
 The Prospectus for the August 30, 1983 offering repeated the March Prospectus' admonition that "there is no assurance that the aggressive cost objective for these products can be achieved."
 
 
 18
 The August Prospectus did not disclose more detailed internal cost analyses which had been undertaken by Convergent. These cost studies were circulated internally, after the August Prospectus. They reflected that Convergent had made progress in its cost reduction battle, but had not yet attained positive gross margins for most NGEN configurations. A September 16, 1983 memo predicted a gross margin of 8% for all sales of NGEN products during 1984. A draft 1984 business plan presented at a September 22, 1983 board meeting assumed that "[c]osts of certain NGEN models" would exceed selling prices in at least the first two quarters of 1984. Convergent never disclosed these internal cost projections to the public.
 
 
 19
 Convergent continued in the second half of 1983 and through the first half of 1984 to try to improve its NGEN gross margins. Convergent management averred in affidavits filed in this suit that at all times they held a good faith belief that NGEN gross margins could eventually be made positive. Convergent's business plan adopted in early 1984 anticipated a gross margin of 14.8% in the first quarter of 1984, and a gross margin of 31.4% later in the year. Convergent achieved these projected gross margins during the first half of 1984.
 
 C. The Workslate Product Line
 
 20
 NGEN, while representing a significant advance over the AWS/IWS workstation, was a continuation of the traditional Convergent business strategy: targeting sales of computer workstations to OEMs rather than the public. Workslate, by contrast, amounted to a revolution. Workslate was basically a portable laptop computer--far more common now than in 1983. Convergent intended to sell Workslate directly to the public through retail and direct sale channels. Efficient production of Workslate required different factory mechanization than that required by both the AWS/IWS workstation and NGEN.
 
 
 21
 In March of 1983, Convergent had only a preliminary idea of the final form Workslate would take. Convergent was still in the process of developing its marketing strategy, and had not crafted a wooden prototype. Nonetheless, Convergent disclosed in the March Prospectus some of the risks it anticipated Workslate to pose:
 
 
 22
 The Company's Portable Computer Systems Division currently is developing and plans to manufacture a family of modular portable workstations ... for business, engineering and administrative applications. The Company expects to introduce these products and begin delivery in the first half of 1984. The development of these products is anticipated to be complex and to require the development of proprietary technology; accordingly, product introduction may be subject to delay, which may adversely impact the Company's ability to market these products.
 
 
 23
 There can be no assurance that the Company will successfully complete the development of its new products, or that it will be successful in manufacturing the new products in high volume or marketing the products in the face of intense competition.
 
 
 24
 The August Prospectus repeated the risks described in the March Prospectus, and added some more. In the August prospectus, Convergent announced that Workslate required "the implementation of advanced manufacturing processes" and "the development and management of retail distribution channels." The Prospectus acknowledged that Convergent had no experience with either of these requirements.
 
 
 25
 Workslate's manufacturing and distribution problems continued to mount as 1983 ended. By early December, Convergent management became aware it would not be able to manufacture Workslate in the volumes projected internally and to the press and analysts.
 
 
 26
 On February 16, 1984, Convergent revealed at a meeting of analysts that it would attempt to raise prices on Workslate, that Workslate was being sold at a price below its production cost and that the product had been prematurely released and needed redesigning. In response, over the next two days Convergent's stock price fell 3 1/8 points, a drop of 17%. The class period ended the day after the February 16 analyst meeting.
 
 STANDARD OF REVIEW
 
 27
 Federal Rule of Civil Procedure 56(c) provides for summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A motion for summary judgment is not meant to precipitate a mini-trial before the real trial begins. However, summary judgment may be granted "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 
 28
 We review a grant of summary judgment de novo. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987). "On summary judgment the inferences to be drawn from the underlying facts contained in [the movant's] materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 DISCUSSION
 
 29
 A. Did the defendants' public disclosures mislead investors?
 
 
 30
 We recently declared in In re Apple Computer Securities Litigation, 886 F.2d 1109, 1118 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990), that "[p]laintiffs may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by the defendant corporation or its insiders." In Apple Computer we reviewed in seriatim sixteen allegedly misleading statements. Liability depended on the plaintiffs' success in demonstrating that one of the statements made by the company was actually false or misleading.
 
 
 31
 Of course, as the plaintiffs note, an issuer's public statements cannot be analyzed in complete isolation. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990).
 
 
 32
 Thus, to prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression.
 
 
 33
 1. Disclosures Regarding the AWS/IWS Product Line
 
 
 34
 a. The March 17 Prospectus
 
 
 35
 The plaintiffs first contend the defendants misled the market by overstating the demand for Convergent's AWS/IWS workstation.[2] The plaintiffs begin by pointing to two statements made in the March Prospectus:
 
 
 36
 Burroughs Corporation accounted for approximately 48% of the total revenue of the Company in 1982. While the level of the Company's future revenues from sales to Burroughs cannot be predicted with any certainty, the Company believes that Burroughs may continue to account for a similar percentage of revenue in 1983.
 
 
 37
 In view of the Company's anticipated orders of its existing products, the Company believes it will be required to increase inventories, to carry increased levels of receivables and to acquire additional capital equipment.
 
 
 38
 These statements were true. Convergent did in fact expect a large increase in orders, and that increase materialized as sales grew in 1983. Moreover, Convergent increased inventories and receivables and acquired substantial capital equipment in 1983. Likewise, Burroughs accounted for 46% of Convergent revenues in 1983.
 
 
 39
 The plaintiffs contend the statements in the March Prospectus, while true as far as they go, did not reveal the entire picture. More specifically, the plaintiffs contend the two statements misled the market because they (1) implied growth would continue at the torrid pace Convergent had set in the past, and (2) failed to reveal that Burroughs had "decreased" its orders for 1983. The district court properly rejected these contentions.
 
 
 40
 i. Implied Growth
 
 
 41
 The challenged statements do not imply any comparison between the rate of past and future growth. They simply report past performance and assert specific limited predictions for the future.
 
 
 42
 Moreover, the market clearly understood that Convergent could not maintain the growth it had enjoyed in the past. In Apple Computer, we noted that, in a "fraud on the market case," see Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), an omission is materially misleading only if the information has not already entered the market. If the market has become aware of the allegedly concealed information, "the facts allegedly omitted by the defendant would already be reflected in the stock's price" and the market "will not be misled." Apple Computer, 886 F.2d at 1114. We concluded: "[I]n a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." Id. at 1115.
 
 
 43
 The market clearly knew demand for the AWS/IWS workstation would decrease as Convergent began to make NGEN available to its customers. As a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals. See, e.g., In re Seagate Technology II Sec. Litig., [1989 Tr. Binder] Fed.Sec.L.Rep. (CCH) p 94,502 at 93,202, 1989 WL 222969 (N.D.Cal.1989) ("technical obsolescence of computer [equipment] in a field marked by rapid technological advances is information within the public domain ...")
 
 
 44
 More specifically, securities analysts knew that NGEN posed just such a risk to sales of the AWS/IWS workstation. As early as February 1983, analysts reported the "major product transition" on the horizon, and noted that "[i]n anticipation of the next generation of products, it is possible that ... major new customers may defer taking delivery of current products in favor of the new line." (Robertson, Colman, Stephens & Woodman's Feb. 3, 1983 research report at 12). Additional information on this situation was reported to the market after the March Prospectus: "[A]s Convergent introduces and readies new products, customers will prolong the decision-making procedure for ordering the current workstations...." (Woodman, Kirkpatrick & Gilbreath's May 6, 1983 research report at 4). Other analysts echoed this refrain: "[T]he product cycle of the current line of workstations is beginning to crest ... new workstation customers will want to wait for NGEN to be available in quantity ... current customers probably will start to work down their IWS/AWS inventories in anticipation of volume availability of N-GEN early next year." (Cowen Institutional Services' May 23, 1983 research report at 3).
 
 
 45
 In all, the district court considered more than 60 analyst reports and articles in the trade and financial press discussing Convergent's prospects for 1983. There can be no doubt that the market was aware AWS/IWS demand would not increase at the same rate it had in the past.
 
 
 46
 ii. Burroughs' "Decreased Orders"
 
 
 47
 The plaintiffs also contend the statements in the March Prospectus misled the public because Convergent did not disclose the alleged "decrease" in Burroughs' orders from 30,000 units to 7,500 units. In making this argument, the plaintiffs do not contend Convergent was obligated to disclose the 30,000-unit figure or the existence of negotiations with Burroughs or the result of those negotiations. They argue instead that even though the 30,000 figure was not disclosed, when Burroughs decided to "decrease" this figure to 17,500, this should have been disclosed. Of course, if there was no "decrease" in committed orders, the plaintiffs' argument fails.
 
 
 48
 There was no such decrease. Undisputed evidence in the record shows that in the computer industry generally, an "agreement to purchase" has far different consequences than an actual "purchase order." Deposition of Allen Michels at 75-76. While the former represents a mere forecast of anticipated product demand, the latter is an actual obligation to buy. Id. Burroughs and Convergent never incorporated into their master Agreement the 30,000-unit figure, and it never became part of Burroughs' contractual obligation. The July 29 letter agreement, which contained the 30,000-unit figure, specifically provided that its terms remained subject to Burroughs' internal approval cycle, and that internal approval was never obtained. Finally, the defendants demonstrated that neither Burroughs nor Convergent viewed the 30,000-unit figure as binding on Burroughs. The plaintiffs, other than pointing to the July 29 letter, offer no evidence disputing this characterization. The plaintiffs' argument, therefore, fails because it mischaracterizes the 17,500 purchase commitment as a decrease in existing orders. The 30,000 figure never was a commitment to buy. The 17,500 figure, which was such a commitment, amounted to nearly a 100% increase over Burroughs' previous purchase commitment.
 
 
 49
 b. The May 18 Report to Shareholders
 
 
 50
 The plaintiffs next point to a statement made in Convergent's May 18, 1983 First Quarter Report to Shareholders: "Our growth in the [first] quarter [of 1983] was the result of increases in shipments to our large OEM customers." This statement purports to describe only the first quarter of 1983. The plaintiffs take no exception to the accuracy of its factual description. The plaintiffs instead contend the statement misled investors by implying that Convergent expected the upward first quarter trend to continue throughout the year. We reject this contention. Although in its annual Form 10-K filing a company must discuss factors "that would cause reported financial information not to be necessarily indicative of future financial operating results," no such obligation exists in the quarterly report at issue here. See 17 C.F.R. § 229.303.
 
 
 51
 c. The August 5 Press Release
 
 
 52
 The plaintiffs also challenge Convergent's August 8, 1983 press release. In this release, Convergent stated:
 
 
 53
 [N]et sales for the third quarter of 1983 will be approximately equal to its net sales for the second quarter because of customer anticipation of deliveries of its new generation of products, which are expected to be available for volume shipments in the first half of calendar 1984. Fourth quarter revenues cannot be predicted with certainty, but could be below third quarter revenues. Because of price reduction on existing products and startup costs associated with three new product lines, the Company anticipates that until volume shipment of its new products begins there will be a decrease in gross profit margin, and may be a substantial decrease in net income.
 
 
 54
 The plaintiffs contend this statement misstated the demand for Convergent's AWS/IWS workstation because Convergent knew at the time that third and fourth quarter revenues for 1983 would actually decline, not just remain flat.
 
 
 55
 The plaintiffs made no such showing. Convergent's revenues for the second half of 1983 were pretty much what the August press release predicted. Third quarter revenues, rather than being merely flat, declined in relation to second quarter revenues, but only by approximately 10%. For the fourth quarter, Convergent actually posted revenues greater than those recorded in the second and third quarters. Thus, while Convergent was somewhat optimistic regarding the third quarter, it actually underestimated fourth quarter revenues.
 
 
 56
 Plaintiffs also contend that if Convergent had excluded from its year-end financial statements one-time software license sales, it would not have shown a profit for the fourth quarter. That may be so. But plaintiffs do not explain why Convergent would want to exclude such sales. Plaintiffs suggest Convergent made the sales in the fourth quarter to post better numbers on its year-end financials and thus further the scheme to inflate its stock price. Plaintiffs provide no evidence to support this suggestion.
 
 2. Disclosures Regarding NGEN Profitability
 
 57
 The plaintiffs argue the defendants misled investors by concealing from the market certain cost and production problems regarding Convergent's NGEN product line. They point out that, because of these cost and production problems, Convergent sold some configurations of the NGEN workstation at a negative gross margin through 1983 and into the beginning of 1984.
 
 
 58
 The defendants contend they adequately disclosed the NGEN cost problems in the March Prospectus:
 
 
 59
 [T]he Company anticipates [NGEN] will be both significantly more powerful and less expensive than existing workstation products.... While the Company believes that the technical risks in the development of these products are well controlled, the product cost objectives are very aggressive and there is no assurance that they can be achieved.
 
 
 60
 Clearly, Convergent's disclosures warned investors that problems with attaining internal cost objectives could impact the ultimate profitability of NGEN. The plaintiffs counter, however, that this disclosure did not sufficiently warn investors as to the particularized risks then known by Convergent, or the magnitude of those risks.
 
 In Apple Computer we stated:
 
 61
 There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay.
 
 
 62
 886 F.2d at 1115. The Fifth Circuit niftily expressed the same principle when it noted:
 
 
 63
 To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.
 
 
 64
 Huddleston v. Herman & MacLean, 640 F.2d 534, 544 (5th Cir.1981), aff'd in relevant part and rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).
 
 
 65
 In Huddleston, the Fifth Circuit found ineffective the prospectus' statement: "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK." Id. at 543 (emphasis in original). Here, by contrast, the March Prospectus virtually overflows with Convergent's repeated emphasis of significant risk factors: (1) "The Company is undertaking substantial development, manufacturing and marketing risks;" (2) "There can be no assurance that the Company will successfully complete the development of its new products or that it will be successful in manufacturing the new products in high volume or marketing the products in the face of intense competition;" (3) "Lack of availability of components from sole or limited sources would have a temporary adverse affect on the Company by delaying shipments;" (4) "While the Company believes that the technical risks in the development of NGEN are well controlled, the product cost objectives are very aggressive and there is no assurance they can be achieved." Convergent's March Prospectus has very little in common with the prospectus in Huddleston.
 
 
 66
 The defendants also continued during the class period to warn investors of the risks posed by NGEN. In the August Prospectus, for example, Convergent disclosed: (1) "The[ ] risks [involved with NGEN] relate to the completion of the new products in accordance with their technical specifications, the availability of advanced components critical to high volume production of the new products and the achievement of product cost objectives;" (2) "As a result of these risks, the new product areas may not contribute to revenues within the time periods the Company anticipates;" (3) "There is no assurance that the aggressive cost objectives for these products can be achieved, nor is there assurance of the availability of necessary quantities of disk drives or the advanced microprocessors necessary to permit timely production of these products;" (4) "NGEN's microprocessor, which to date has only been manufactured in limited quantities, is being allocated by its sole source manufacturer." No investor, in the face of these substantive disclosures, could reasonably conclude that Convergent had surmounted all obstacles in NGEN's path.
 
 
 67
 True, Convergent had at its disposal more detailed internal NGEN projections. But Convergent was not obliged to disclose these internal projections. As we explained in Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir.1980):
 
 
 68
 It is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to allow them to be disclosed to the public.
 
 
 69
 (emphasis in original).
 
 
 70
 In support of their argument that Convergent should have disclosed its internal projections, the plaintiffs point to Item 303(a)(3)(ii) of SEC Regulation S-K which requires that "known trends or uncertainties" be disclosed in certain filings with the SEC. Without passing on the relevance of Regulation S-K to this case, we note that Instruction 7 to Item 303(a) explicitly states that "forward-looking" information need not be disclosed in Regulation S-K filings. 17 C.F.R. § 229.303(a) (1990).
 
 3. Disclosures Regarding Workslate
 
 71
 The plaintiffs next insist, as they did regarding NGEN, that the defendants' risk disclosures were too general and were misleading given the known delays and mechanization problems that existed with Workslate. We disagree.
 
 
 72
 The March and August Prospectuses provided more than generalized statements of risk. For example, the August Prospectus warned: (1) "For [Workslate], risks also include the implementation of advanced manufacturing processes and the development and management of retail distribution channels;" (2) "The successful volume production and sale of [Workslate] will be dependent upon the timely availability of several advanced components (some of which have not been manufactured by their suppliers in volume to date), the implementation of the Company of advanced manufacturing processes ... and the development and management by the Company of retail channels of distribution, an area in which the Company has no prior experience;" (3) "The Company has not manufactured its new products in volume.... All of the Company's products use new components based on advanced technology. Many of these new components have yet to be manufactured in volume by their suppliers. The Company's ability to manufacture these products may be adversely affected by the inability of the Company's vendors to supply high quality components in adequate quantities;" (4) "In light of the complex nature of the manufacturing process of its new products, the Company may experience unanticipated problems in their manufacture. One of these, [Workslate], will use advanced manufacturing processes which have not to date been widely used in the United States."
 
 
 73
 The plaintiffs argue that apart from the foregoing, the defendants were obliged to release information as it became known to them. That is, the plaintiffs contend Convergent had a duty to disclose the progress of its efforts to implement a new mechanization structure. We reject this argument.
 
 
 74
 A company "need not detail every corporate event, current or prospective ..." Marx v. Computer Sciences Corp., 507 F.2d 485, 491 (9th Cir.1974). The securities laws do not require management "to bury the shareholders in an avalanche of trivial information--a result that is hardly conducive to informed decisionmaking." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448-49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).B. Underwriter Liability for Alleged Misstatements in the Research Reports
 
 
 75
 As to the underwriters, the plaintiffs contend the district court erred when it determined their research reports "unquestionably have a sufficient factual and/or historical basis so that Rule 10b-5 liability cannot be imposed on the underwriters." In re Convergent Technologies, 721 F.Supp. at 1139. The plaintiffs apparently concede that liability would not attach if the research reports were supported by a sufficient historical or factual basis. See Meier v. Texas Int'l Drilling Funds, Inc., 441 F.Supp. 1056, 1063 (N.D.Cal.1977). They also apparently concede that, barring any additional knowledge, an analyst could reasonably support an optimistic report concerning Convergent's future on the company's history of success. See Convergent Technologies, 721 F.Supp. at 1139.
 
 
 76
 The plaintiffs provide no evidence, aside from pure supposition, to support their contention that the underwriter defendants knew of additional facts they failed to reveal in their research reports. The district court correctly granted the underwriters' motion for summary judgment.
 
 C. The Section 11 Claim
 
 77
 Plaintiffs finally argue the district court erred when it determined they failed to institute their section 11 suit before the expiration of the applicable statute of limitations. We need not address this contention. No liability can attach under section 11 unless a prospectus contains "an untrue statement of a material fact or [omits] to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(a) (1988). As we have previously stated, no misleading statements or material omissions exist.
 
 
 78
 AFFIRMED.
 
 
 
 [1]
 "Gross margin" refers to the difference between the sales price and the direct cost of the goods, not including the company's fixed costs. Convergent's fixed costs in 1983 and 1984 amounted to 22% and 16% of product sales respectively. This meant that for Convergent to break even on its direct costs, its gross margins in those years had to be 22% and 16% respectively. A "negative gross margin" is a gross margin less than the direct cost of the goods
 
 
 [2]
 This is a "fraud on the market" case. In such a case, the plaintiffs need not show that they themselves actually relied on any particular misrepresentation or omission. Instead, they need only show that they relied on the integrity of the price of the stock as established by the market, which in turn is influenced by information or the lack of it. The "fraud on the market" doctrine recognizes that most investors rely on the market to evaluate information for them, rather than on their own independent analysis of a stock's value. An investor's reliance on the market, therefore, is equivalent to reliance upon statements made to the market, or the nondisclosure of material information. See Apple Computer, 886 F.2d at 1113-14