82 F.3d 1480
 Fed. Sec. L. Rep. P 99,232, 96 Cal. Daily Op. Serv. 3200,
96 Daily Journal D.A.R. 5283
In re STAC ELECTRONICS SECURITIES LITIGATION.
Timothy J. ANDERSON; Neil Singer; Arthur Singer, on Behalf
of Themselves and All Others Similarly Situated,
Plaintiffs-Appellants,
v.
Gary W. CLOW; Douglas Whiting; Robert Johnson; Alex Brown
& Sons Incorporated; Lawrence Finch, et al.,
Defendants-Appellees.
 No. 94-56232.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 6, 1996.
Decided May 7, 1996.
 
 William S. Lerach and Leonard B. Simon, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, California, for plaintiffs-appellants.
 Steven M. Schatz, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California, and Charlene S. Shimada, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Southern District of California John S. Rhoades, District Judge, Presiding. No. CV-92-1120-JSR.
 Before: WALLACE, FERGUSON, and T. G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Timothy J. Anderson and other class representatives (collectively "Anderson") who purchased stock in Stac Electronics ("Stac") between May 7 and July 20, 1992, appeal the district court's dismissal of their class action under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o, and Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t. Anderson alleges that Stac, certain of its officers and directors, and its lead underwriters, Alex. Brown & Sons, Inc., and Montgomery Securities ("Alex. Brown" and "Montgomery," respectively; collectively, "Underwriters"), made material misrepresentations or omissions regarding Stac's initial public offering ("IPO") of May 7, 1992. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 This case arises from Stac's May 7, 1992, IPO of stock in its computer products company. Stac's most prominent product is the "Stacker," a data-compressing device which doubles storage capacity of disk drives in computers using Microsoft's MS-DOS and compatible systems.
 
 
 3
 The district court related the following facts, which are not disputed by the parties:
 
 
 4
 Before it went public, Stac's performance was mixed: it reported net losses per share in 1988, 1989, and 1990, and a net income per share of $.01 in 1991. It also reported revenues hovering around three quarters of a million dollars for 1988 and 1989, with increased revenues in 1990 (to $1.7 million) and 1991 (to $8.3 million).
 
 
 5
 There was a pronounced move upward--in both revenues and earnings per share--immediately prior to the initial public offering of Stac stock. While Stac reported revenues of $2.3 million and a loss of $.04 per share in the six months prior to March 31, 1991, it reported revenues of $17 million and earnings of $.21 per share in the six months prior to March 31, 1992. The increased revenues and earnings for the 1992 six month period derived from sales of Stacker.
 
 
 6
 On May 7, 1992, Stac went public, with an initial offering of 3,000,000 shares of common stock. The stock was sold to the public at $12.00 a share, with the individual named Defendants--except for Hoff, Finch and Robelen--selling some 508,000 shares. Neither Hoff, Finch, Robelen nor any of the venture capital Defendants is alleged to have sold any Stac stock during the class period [May 7 to July 20, 1992]. Defendants Alex. Brown & Sons, Inc. and Montgomery Securities acted as co-lead underwriters for the offering; they received substantial fees--some $2.5 million--for their services.
 
 
 7
 In connection with the IPO, Stac issued a Registration Statement and Prospectus ("Prospectus"), dated May 7, 1992, which included a four-page section on risk factors warning investors, inter alia, of Stac's competition, its dependence on Stacker, its reliance on distributors, its limited source of supply, and the potential volatility of its stock price. [See Prospectus at 5-8.] The Prospectus specifically discussed Microsoft's competitive threat, Stac's return policy and return allowances, and the possible effects on revenues of "channel fill," or heavy purchasing by distributors immediately following the introduction of a new product. [Id.]
 
 
 8
 Apart from the Prospectus, information about Stac was disseminated to the public through "roadshow" presentations preceding the IPO and through analysts' reports and press statements by Stac officers and Underwriters following the IPO. All of these portrayed Stac as a good investment. While these portrayals at first seemed accurate--Stac rose to $15 after the IPO--success was short-lived. Stac's stock price fell on July 2, 1992, on the heels of another computer software company's announcement of poor third quarter results.
 
 
 9
 Stac Director Gary Clow ("Clow") and both Underwriters made statements to Dow Jones News Wire distinguishing Stac from the faltering software company. While Alex. Brown continued to rate Stac highly, Montgomery reduced its rating and earnings estimate for Stac on July 6, 1992. On July 20, 1992, Stac disclosed a disappointing third quarter performance, and on July 21, 1992, Stac stock declined to $5.50 per share. Within two days, plaintiffs filed suit. This initial suit was consolidated in the First Amended Class Action Complaint ("the FAC"), filed December 4, 1992.
 
 
 10
 The FAC asserted four claims for relief: I) against all defendants, alleging violation of Section 11 of the Securities Act, 15 U.S.C. § 77k(a); II) against all individual defendants and venture capital defendants, alleging controlling person liability under Section 15 of the Securities Act, 15 U.S.C. § 77o; III) against all defendants, alleging violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5; and IV) against all individual defendants and venture capital defendants, alleging controlling person liability[1] under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.
 
 
 11
 The complaint basically alleged that Stac went public knowing (but without disclosing) that Microsoft was about to come out with a competitive product (a new version of DOS incorporating Stacker-like data compression capabilities) that would take away Stac's market; that Stac engaged in sham licensing negotiations with Microsoft in order to stall introduction of its new product until Stac could make an IPO and unload stock; and that Stac insiders artificially inflated Stac's stock price prior to the IPO through channel "stuffing" and other fraudulent practices.
 
 
 12
 The district court dismissed the FAC with leave to amend in a detailed order dated September 17, 1993. Anderson v. Clow, Fed. Sec. L. Rep. (CCH) p 97,807 at 97,994-95 (S.D.Cal.1993). The district court held that plaintiffs had failed to state a claim against Stac, the Underwriters, or any other named defendant, primarily on the basis of its finding that, to the extent it was required to do so, Stac had adequately disclosed all purported omissions in its Prospectus in a way that rendered the Prospectus not misleading. The order also stayed discovery.
 
 
 13
 On November 18, 1993, the plaintiffs filed a Second Amended Complaint ("the SAC"), asserting the same claims as the FAC and adding nine new individual defendants. The district court dismissed the SAC with prejudice for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and for failure to meet the particularity requirements of Fed.R.Civ.P. 9(b). Anderson v. Clow, Fed. Sec. L. Rep. (CCH) p 98,367 (S.D.Cal.1994). Like the first order, the order appealed from is extremely thorough. Anderson's appeal was timely.
 
 DISCUSSION
 
 14
 Standard of review.
 
 
 15
 Dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is reviewed de novo. In re VeriFone Sec. Litig., 11 F.3d 865, 868 (9th Cir.1993). "All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff." In re Wells Fargo Sec. Litig., 12 F.3d 922, 925 (9th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). However, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." VeriFone, 11 F.3d at 868.
 
 
 16
 * Fraud on the Market.
 
 
 17
 Anderson argues that Stac committed a "fraud on the market" through its failure to disclose material facts in its Prospectus and other public statements. In such cases, a "plaintiff claims that he was induced to trade stock not by any particular representations made by corporate insiders, but by the artificial stock price set by the market in light of statements made by the insiders as well as all other material public information." In re Apple Computer Sec. Litig., 886 F.2d 1109, 1114 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).
 
 
 18
 To prevail on this theory, a plaintiff "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." In re Convergent Technologies Sec. Litig., 948 F.2d 507, 512 (9th Cir.1991). "If, however, the information that defendants are alleged to have withheld from or misrepresented to the market has entered the market through other channels, the market will not have been misled, and ... plaintiffs' claims ... will fail." Kaplan v. Rose, 49 F.3d 1363, 1376 (9th Cir.1994) (citations omitted), cert. denied, --- U.S. ----, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995).
 
 
 19
 As the district court observed, Anderson's fraud on the market claim is undermined by its own pleaded assertions that demand for Stacker had weakened due to "customer resistance to purchasing separate data compression software products in anticipation of the availability of upgraded personal computer operating systems that included data compression capacity."[2] [SAC, ER 45, p 4.] According to the SAC, this weakened demand was known to insiders but not to the public. However, customer resistance to purchasing a product in anticipation of newer products is precisely the sort of market awareness that we have held to defeat claims of fraud on the market. Convergent, 948 F.2d at 513. If customers knew that upgraded operating systems were likely to include data compression, the market was aware that Stacker could become obsolete. We have observed that, "[a]s a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals." Id. Indeed, "technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain." Id. (quotations and alterations omitted).
 
 
 20
 Stac so cautions in its Prospectus: "The market for data compression products is characterized by rapidly changing technology, evolving industry standards and frequent new product introductions ... [which] could render existing products obsolete and unsalable." [Prospectus at 6.] Stac's Prospectus also clearly acknowledges the company's dependence on the Stacker product. [Id. at 5, 24.] Even without such disclosures on the part of Stac, however, the adequacy of which we discuss at greater length below, investors could easily have predicted that if Stac's key product were to lose its market share, the company would be in serious trouble. See In re Worlds of Wonders Sec. Litig., 35 F.3d 1407, 1420 (9th Cir.1994) ("WOW ") ("[i]t was obvious to any reasonable investor that if either of WOW's two products were to lose favor with consumers, the company would be devastated ...." (quotations omitted)), cert. denied, --- U.S. ----, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995) and --- U.S. ----, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995). Accordingly, we agree with the district court that Anderson has failed to allege a claim for fraud on the market.
 
 II
 
 21
 Securities claims.
 
 
 22
 Anderson argues that by "falsifying" its financial statements and failing to disclose pertinent information in its possession regarding Microsoft's plans to include data compression in its newest version of DOS, Stac misled investors and violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a), Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. The district court held that the SAC failed to state a claim under Section 11, Section 10(b), or Rule 10b-5. It further held that the SAC failed to plead with sufficient particularity its Section 10(b) and Rule 10b-5 claims, as required by Fed.R.Civ.P. 9(b). We address the adequacy of Anderson's claims de novo. VeriFone, 11 F.3d at 868.
 
 
 23
 On appeal, Anderson stresses the following: Stac and its officers: 1) failed to disclose imminent competition from Microsoft and deliberately stalled licensing negotiations with Microsoft in order to delay Microsoft's market entry; and 2) falsified its financial statements by artificially inflating reported results through channel "stuffing," accomplished by offering customers "special terms," including discounts and exceptional rights of return; understating its existing reserves; and failing to disclose Stac's "inevitable" impending decline.
 
 
 24
 Both Section 11 of the Securities Act and Section 10(b) of the Exchange Act require a plaintiff "adequately [to] allege a material misrepresentation or omission." Id. While Section 11 pertains to a company's prospectus alone, Section 10(b) also covers statements made in other documents or in oral communications. Section 11 creates a private remedy for any purchaser of a security if any part of the registration statement,
 
 
 25
 when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading ....
 
 
 26
 15 U.S.C. § 77k(a).
 
 
 27
 Section 10(b) of the Exchange Act of 1934 makes it unlawful "for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rule § and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of Section 10(b) provides that:
 
 
 28
 It shall be unlawful for any person ...
 
 
 29
 (a) To employ any device, scheme, or artifice to defraud,
 
 
 30
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
 
 
 31
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 32
 in connection with the purchase or sale of any security.
 
 
 33
 17 C.F.R. § 240.10b-5.
 
 
 34
 It is well established that claims brought under Rule 10b-5 and Section 10(b) must meet the particularity requirements of Fed.R.Civ.P. 9(b). Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir.1987). Rule 9(b) states that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."
 
 
 35
 Anderson disputes, however, the applicability of Rule 9(b) to its Section 11 claims. The district court considered plaintiffs' Section 11 and Section 10(b) claims separately, dismissing the former under Rule 12(b)(6) and the latter under Rule 9(b), though it applied similar standards and reasoning to each. We recently affirmed a district court's dismissal of 1933 and 1934 Act claims, including Section 11 claims, for failure to satisfy Fed.R.Civ.P. 9(b). In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 592 (9th Cir.1995) ("GlenFed III ") (on remand from en banc decision, 42 F.3d 1541 (9th Cir.1994)). We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when, as here, they are grounded in fraud rather than negligence.[3] See Melder v. Morris, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 287-89 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); Sears v. Likens, 912 F.2d 889, 892-93 (7th Cir.1990)). Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints "as a pretext for the discovery of unknown wrongs," to protect professionals from the harm that comes from being subject to fraud charges, and to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985). The same policy considerations apply to Section 11 claims sounding in fraud.
 
 
 36
 We closely examined the role of Rule 9(b) in the securities law context in our recent en banc decision In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir.1994) (en banc) ("GlenFed II "). With respect to scienter, we held that plaintiffs need only "say[ ] [it] existed." Id. at 1547. However, we went on to hold that plaintiffs "must aver with particularity the circumstances constituting the fraud." Id. We explained that time, place and content allegations, while necessary, are insufficient by themselves to state a claim for fraud. Id. at 1547-48. "The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." Id. at 1548. Further, the statement or omission must be shown to have been false or misleading when made. Id. at 1548-49.
 
 
 37
 We agree with Anderson that our clarification of the scienter requirement in GlenFed II nullifies the district court's conclusion that Anderson's claims must fail because Anderson did not plead scienter with particularity. The SAC sufficiently avers fraudulent intent on the part of Stac and its officers for the purpose of Rule 9(b). However, the remainder of our decision in GlenFed II supports the conclusion that Anderson's claims must nevertheless fail if, as the district court found, Anderson failed to plead the underlying fraud with particularity. [See ER 80 at 16-31, 39, 45.]
 
 
 38
 A. Stac's Prospectus.
 
 
 39
 The district court devoted much of its order to consideration of Stac's Prospectus.[4] The court found that the alleged omissions were either actually disclosed, or need not have been disclosed, in that document. The "materiality" of an omission is a fact-specific determination that should ordinarily be assessed by a jury. Fecht v. The Price Co., 70 F.3d 1078, 1080-81 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." Id. at 1081 (quotations and alterations omitted).
 
 
 40
 1. Microsoft's plans to include data compression.
 
 
 41
 The gravamen of Anderson's complaint concerns Stac's alleged failure to disclose its knowledge of Microsoft's plans to introduce data compression in its upcoming version of DOS. According to Anderson, Stac entered into "sham" licensing negotiations with Microsoft merely to stall Microsoft's introduction of its new product. In the SAC, Anderson also alleged that Stac's patents were inadequate to prevent others from using its technology to create competitive products. Prior to the district court's ruling, however, Stac won a $120 million judgment against Microsoft for patent infringement relating to Stacker. See Stac Electronics v. Microsoft Corp., Civil No. 93-0413-ER (Bx) (C.D.Cal. Feb. 23, 1994). The district court properly took judicial notice of this judgment in determining that the proprietary and patent information provided in the Prospectus was not misleading. [ER 80 at 17.] Anderson does not raise the patent issue on appeal.
 
 
 42
 Regarding the threat of Microsoft "looming," the district court correctly observed that the Prospectus makes detailed disclosures concerning the risk of competition. For instance, the Prospectus states that "[a] number of competitors offer products that currently compete with [Stac's] products" and that these companies "could seek to expand their product offerings by designing and selling products using data compression or other technology that could render obsolete or adversely affect sales of [Stac's] products." [Prospectus at 5.] After noting Stac's dependence on sales of DOS-compatible products, the Prospectus observes that:
 
 
 43
 One developer of a compatible operating system has licensed a competitive data compression product for incorporation into the latest version of the operating system. There can be no assurance that Microsoft ... will not incorporate a competitive data compression technology in their products or that such a technology will not emerge as an industry standard.
 
 
 44
 [Id. (emphasis added).] Further, the Prospectus reveals that "[Stac] has licensed and intends to license portions of its core technology to others," a practice which it cautions could result in more competition and price reductions. [Id.]
 
 
 45
 Anderson alleges that the "no assurance" language is inadequate and that Stac committed fraud because it knew that Microsoft was going to come out with a competitive product, but masked this knowledge as a contingency. Anderson quotes repeatedly the following statement: " 'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.' " Convergent, 948 F.2d at 515 (quoting Huddleston v. Herman & MacLean, 640 F.2d 534, 544 (5th Cir.1981), aff'd in relevant part and rev'd in part on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).
 
 
 46
 We have rephrased this principle as follows: " 'There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay.' " Id. (quoting Apple Computer, 886 F.2d at 1115). The latter scenario characterizes the situation we encountered in Warshaw v. Xoma Corp., 74 F.3d 955 (9th Cir.1996). Corporate officers of Xoma, a biotech company which had yet to make a profit on its research, assured stockholders that FDA approval of its new drug was imminent, in spite of knowledge that the drug might not work and was unlikely to receive such approval. Id. at 957-59.
 
 
 47
 Anderson has not alleged any such contradictory statements here. In Convergent, we proceeded to distinguish the case before us from the Fifth Circuit case quoted, noting that Convergent's prospectus "virtually overflow[ed]" with risk factors, and to hold that the defendant company was not obliged to disclose its internal projections because such projections are tentative. 948 F.2d at 515-16. We cited as adequate multiple warnings in the Convergent prospectus stating that "there is no assurance" of financial success given a variety of named obstacles to production. Id. We therefore cannot agree with Anderson's characterization of Stac's "no assurance" language as "misleading" or inadequate.
 
 
 48
 Anderson argues that Stac should have explicitly disclosed its ongoing negotiations with Microsoft and its knowledge that Microsoft intended to introduce data compression technology in its new version of DOS. In short, Anderson suggests that Stac was obliged not only to report on its own product line and marketing plans, but to report on and make predictions regarding Microsoft's intentions.
 
 
 49
 Stac counters, and we have held, that a company is not required to forecast future events or to caution "that future prospects [may not be] as bright as past performance." WOW, 35 F.3d at 1420 (" 'Absent allegations that [the issuer] withheld financial data or other existing facts from which forecasts are typically derived, the alleged omissions are not of material, actual facts. Therefore, the forecasts need not have been disclosed, and the failure to make the omitted forecasts did not render the other statements that were made misleading.' ") (quoting VeriFone, 11 F.3d at 869).
 
 
 50
 We agree with Stac that another company's plans cannot be known to a certainty. Even assuming, as we must, that Microsoft had informed Stac that it planned to introduce data compression, Stac could not have known whether or not Microsoft would truly do so. As Stac points out, the contingency of the event is underscored by the fact that a competitive product was liable to violate Stacker's patent, as borne out by the state judgment against Microsoft. Also, the market already knew of the potential for Microsoft's inclusion of data compression technology, as alleged by Anderson in the FAC. See footnote 2, supra.
 
 
 51
 2. Stac's financial statements.
 
 
 52
 Anderson also argues that Stac falsified its financial statements in the Prospectus by failing to disclose its channel-"stuffing" practices, its inadequate reserves, and its liberal distribution terms, all of which Anderson characterizes as illegitimate "borrowing" against the future to inflate its returns in the quarter prior to the public offering.
 
 
 53
 As the district court found, however, the Prospectus describes the phenomenon of channel-filling with its attendant risks, spells out Stac's liberal return policy, warns investors of Stac's exposure to the risk of product returns, and advises investors not to predict future returns on the basis of the results of any single quarter. The following excerpts from the Prospectus are instructive.
 
 
 54
 a. Channel fill:
 
 
 55
 The Company's results of operation are subject to significant quarterly variations as a result of a number of factors and risks, including ... the phenomenon of "channel fill".... Channel fill often occurs following the introduction of a new product or a new version of a product as distributors buy significant quantities of a new product or version in anticipation of sales of such product or version. Following such purchases, the rate of distributor's purchases may decline.
 
 
 56
 [Prospectus at 16.]
 
 
 57
 b. Return policy, risk of returns, and return allowances:
 
 
 58
 During the first six months of fiscal 1992 the Company's distributors and software reseller returned substantial quantities of the initial version of Stacker in exchange for version 2.0 of Stacker. Such returns did not materially impact operating results for the first six months of 1992, however, as allowances for returns of the initial version of Stacker had been established in fiscal 1991.
 
 
 59
 * * * * * *
 
 
 60
 Like other manufacturers of packaged software products, the Company is exposed to the risk of product returns from distributors and direct reseller customers.
 
 
 61
 [Id. at 6-7.]
 
 
 62
 The Company's return policy allows its distributors to return any new, unused product in the distributor's inventory within ... 60 days from the notice of discontinuance of any product, or any version of a product, for a credit or cash refund. Although the Company believes that it provides adequate allowances for returns, there can be no assurance that actual returns in excess of recorded allowances will not result in a material adverse effect on business, operating results and financial condition.
 
 
 63
 [Id. at 22.]
 
 
 64
 c. Quarterly results:
 
 
 65
 The Company has historically experienced significant fluctuations in its operating results, including net income, and anticipates that these fluctuations will continue. The Company operates with relatively little backlog, and the majority of its revenues in each quarter results form orders received in that quarter. Consequently, if near-term demand for the Company's product weakens in a given quarter, the Company's operating results for that quarter would be adversely affected.... As a result, the Company believes that period-to-period comparisons of its operating results should not be relied upon as an indication of future performance.
 
 
 66
 [Id. at 6. See also id. at 15, 17.]
 
 
 67
 The parties dispute whether, as a matter of law, these statements can be said to disclose purported omissions and adequately caution investors as to specific risks. We have recognized that the "bespeaks caution" doctrine " 'provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.' " Fecht, 70 F.3d at 1081 (quoting WOW, 35 F.3d at 1413) (alterations omitted).[5] The doctrine serves to "minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement." WOW, 35 F.3d at 1415 (quotations omitted).
 
 
 68
 However, "[i]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading." Fecht, 70 F.3d at 1082 (emphasis added). "A motion to dismiss for failure to state a claim will succeed only when the statements containing defendants' challenged documents include enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Id. (citation and quotations omitted).
 
 
 69
 The district court did not rely on the bespeaks caution doctrine here because it found that the Prospectus contained no forward-looking representations. [SER 37:23.] By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements. Id. at 1413 n. 2. However, we have observed that the doctrine "merely represents the pragmatic application of two fundamental concepts in the law of securities fraud: materiality and reliance." WOW, 35 F.3d at 1414.
 
 
 70
 [T]he 'bespeaks caution' doctrine has developed to address situations in which optimistic projections are coupled with cautionary language ... affecting the reasonableness of reliance on and the materiality of those projections. To put it another way, the 'bespeaks caution' doctrine reflects the unremarkable proposition that statements must be analyzed in context.
 
 
 71
 Id. (quoting Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir.1994)). In WOW, we approved the district court's application of the "Basic test of materiality" to plaintiffs' claims concerning material omissions, which states that for nondisclosure to be actionable, " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " Id. at 1413 n. 2 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)) (alterations omitted).
 
 
 72
 Here, Anderson characterizes certain claims regarding Stac's Prospectus as both material omissions and misstatements. For example, Anderson alleges that Stac failed to disclose its inadequate reserves for returns. At the same time, Anderson characterizes the Prospectus's statement that "the Company believes it provides adequate allowances for returns" as an affirmative misstatement. The quoted sentence reads in full: "Although the Company believes it provides adequate allowances for returns, there can be no assurance that actual returns in excess of recorded allowances will not result in a material adverse effect on business, operating results, and financial condition." [Prospectus at 7.]
 
 
 73
 Anderson further charges that Stac attributes its increase in revenues in the second quarter of 1992 to awards and favorable reviews, when in fact the increase was due to channel-fill, or what Anderson terms channel-"stuffing." In fact, Stac's conjecture that the 1992 increases were due "partially" to awards and reviews appears in the context of a section on "quarterly trends" which leads off with an explanatory and cautionary statement about the effects of channel fill on revenue. [Prospectus at 16-17.] Analyzing the quoted statements in context leads to the inexorable conclusion that investors were specifically and adequately cautioned about the relevant risks. Insofar as Stac's alleged misstatements can be viewed as "optimistic projections," they are more than adequately covered by the bespeaks caution doctrine.
 
 
 74
 Bespeaks caution aside, Anderson fails to make precise allegations explaining how the alleged misstatements were misleading or untrue when made. "The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." GlenFed II, 42 F.3d at 1548. Statements which imply factual assertions are actionable if any one of the following statements is inaccurate: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). To the extent that Anderson alleges that Stac's Prospectus includes affirmative misstatements, it fails to make any showing that any of the implied assertions are inaccurate.
 
 
 75
 The remaining claims against Stac's Prospectus concern omissions, which are necessarily historical in nature, as companies are not required to predict the future. WOW, 35 F.3d at 1420; VeriFone, 11 F.3d at 869. Like the prospectus in Convergent, the Stac Prospectus neither stints on warnings nor fails to disclose Stac's practices, but "fairly overflows" with specific and detailed cautionary language. Convergent, 948 F.2d at 515. We agree with the district court that the Prospectus adequately disclosed the information Anderson alleges Stac to have concealed and that it contained "enough cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." Fecht, 70 F.3d at 1082 (citation and quotations omitted). In light of the foregoing, we hold that the district court properly dismissed Anderson's Prospectus-based claims.
 
 B. Pre-offering statements--roadshows.[6]
 
 76
 The district court found that Anderson's allegations concerning roadshow presentations were not stated with adequate particularity under Rule 9(b). We agree with the district court's assessment of the roadshow allegations.
 
 
 77
 Anderson states time, place and content of the roadshows in the broadest of terms, and suggests that Stac officers made positive forecasts to promote the Stac offering. This does not suffice under Rule 9(b) or GlenFed II, especially given that Anderson had fourteen months in which to undertake discovery prior to the stay. See Neubronner v. Milken, 6 F.3d 666, 671-72 (9th Cir.1993). We hold that the district court properly dismissed these claims under Rule 9(b).
 
 III
 
 78
 Underwriters' liability.
 
 
 79
 Anderson alleges that Stac, its outside directors, and other venture capital defendants, schemed with the Underwriters to project false reports following the IPO. But it provides no specific facts--no names, no meetings, no internal memoranda or documents, no specific conduct or statement--in support of its theory. Nor does it explain the disparity in the projections offered by Alex. Brown, which remained positive in its forecast, and by Montgomery, which lowered its rating of Stac after the failure of another computer company.
 
 
 80
 "In order to be liable for unreasonably disclosed third-party forecasts, defendants must have put their imprimatur, express or implied, on the projections." In re VeriFone Sec. Litig., 784 F.Supp. 1471, 1486 (N.D.Cal.1992), aff'd, 11 F.3d 865 (9th Cir.1993). The facts must be stated with particularity as required by Fed.R.Civ.P. 9(b). Id. at 1486-87. "Plaintiffs must show why the projection disclosed lacked a reasonable basis." Id. at 1487. Finally,
 
 
 81
 "Issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis'--a question on which other estimates may reflect without automatically depriving the published one of foundation."
 
 
 82
 Id. (quoting Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 516 (7th Cir.1989)). Anderson cannot rely on the group published information exception to Rule 9(b) because the SAC contains no allegations that outside directors or underwriters "either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." GlenFed III, 60 F.3d at 593.
 
 
 83
 We agree with the district court that "[b]ecause the group pleading doctrine is not available, and because the roles of the underwriter, outside director, and venture capital defendants in propounding the allegedly fraudulent statements are left unspecified, it follows that Plaintiffs have not met the specificity requirements of Rule 9(b)."
 
 IV
 
 84
 Statute of limitations.
 
 
 85
 The statute of limitations governing Section 11 requires filing a complaint within three years of offer or sale of a security or within one year of actual notice or inquiry notice of an untrue or misleading statement. 15 U.S.C. § 77m. This section also governs Section 10(b). Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).
 
 
 86
 Anderson filed the SAC one year and four months after the original complaints were filed, naming for the first time the nine new defendants. Anderson contends it did not have enough information earlier to suspect the involvement of the new defendants. Given, however, that plaintiffs were clearly aware of or suspected fraud at the time they filed their first complaint, and given further that all of the new defendants were named in the Prospectus and added to the SAC on the basis of their corporate positions alone, the district court correctly found that plaintiffs had adequate notice. Accordingly, we affirm the district court's decision to dismiss claims concerning the new defendants.
 
 
 87
 For the reasons stated above, the district court's opinion is affirmed.
 
 
 88
 AFFIRMED.
 
 
 
 [1]
 Plaintiffs on appeal offer no arguments concerning controlling person liability under Section 20 or under Section 15
 
 
 [2]
 In its first amended complaint ("FAC"), Anderson alleged that "the demand for Stacker was being severely diminished by the emergence of competitive products and by anticipation that new software programs to be introduced by market leaders including ... Microsoft's DOS.6, would include data compression, making Stacker obsolete." [FAC p 43(e); SER 27-28.]
 
 
 [3]
 Anderson argues that it specifically disclaimed any allegations of fraud with respect to its Section 11 claims. These nominal efforts are unconvincing where no effort is made to show negligence on Stac's part and the gravamen of the complaint is plainly fraud
 
 
 [4]
 The district court considered the full text of the Prospectus, including portions which were not mentioned in the complaints. We note that such consideration is appropriate in the context of a motion to dismiss, and does not convert the motion into one for summary judgment. " '[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.' " Fecht v. The Price Co., 70 F.3d 1078, 1080 n. 1 (9th Cir.1995) (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994)), cert. denied, --- U.S. ----, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996)
 
 
 [5]
 The bespeaks caution doctrine applies to both Section 10(b) and Section 11 claims. WOW, 35 F.3d at 1415 n. 3
 
 
 [6]
 Anderson does not dispute on appeal the district court's rulings regarding post-offering statements. Accordingly, we deem plaintiffs' arguments concerning such statements waived. Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco, 979 F.2d 721, 726 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993)