**In re SYNTEX CORP. SECURITIES LITIGATION.**

**Arthur M. ROSENBAUM; Richard Gorosh, On Behalf of themselves and all others Similarly Situated; Kenneth Wynne; Judy Wynne; Robert Younger; Jerrald Schaffer; Joseph Cocola; Rita Cocola; Robert K. Greenfield; Amy Tresti; Alan R. Tresti; Steven J. Gutter; Carol Morris; Nicholas J. Donohue; G. King Perry; Henry Cole; Bori Berkow and Eric Rose, Plaintiffs–Appellants,**

v.

**SYNTEX CORPORATION; Paul E. Freiman; James N. Wilson; John Fried; Marvyn Carton; Allen & Company Incorporated and Thomas Gutshall, Defendants–Appellees.**

No. 94–16156.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 1995.

Decided Sept. 13, 1996.

Jan M. Adler, William Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, California, for plaintiffs-appellants.

Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, California, for defendants-appellees.

Before: NORRIS, BEEZER, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

## OVERVIEW

Plaintiffs, purchasers of Syntex Corporation's common stock, appeal from the district court's order dismissing their securities class action suit alleging "fraud on the market." In their Second Amended Complaint, Plaintiffs allege that Syntex and several of its directors and officers violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 when they issued false statements about the company's financial outlook and, in turn, artificially inflated the value of Syntex's stock. The district court granted Defendants' motion to dismiss finding that: 1) Defendants' alleged statements were not actionable; 2) Defendants were not responsible for analysts' statements; and 3) the statute of limitations barred Plaintiffs from extending the class period stated in the First Amended Complaint. We affirm.

## BACKGROUND

Syntex Corporation (Syntex) is an international pharmaceutical company headquartered in Palo Alto, California. In 1993, Syntex's patent on Naprosyn, its flagship product, was to expire. Plaintiffs allege that although Defendants expected revenues from Naprosyn to decline due to the adverse impact of a consent decree entered into with the FDA in October 1991 and competition from generic substitutes, they concealed the adverse impact of the consent decree and issued a series of statements representing that Syntex would maintain strong profit growth due to the introduction of an over-the-counter version of Naprosyn (OTC Naprosyn) and two new products, Ticlid and Oral Toradol. Plaintiffs allege that Defendants intended their falsely optimistic forecasts to artificially inflate the value of Syntex stock.[1]

## PRIOR PROCEEDINGS

Plaintiffs filed their First Amended Class Action Complaint on November 13, 1992, on behalf of those persons who purchased Syntex stock at allegedly artificially inflated prices between November 25, 1991 and May 26, 1992. On January 13, 1993, the district court certified the class. On September 1, 1993, the district court dismissed the First Amended Complaint with leave to amend. On November 30, 1993, Plaintiffs filed their Second Consolidated Amended Class Action Complaint on behalf of the class of persons who purchased Syntex stock between November 25, 1991 and August 6, 1992. On May 27, 1994, the district court dismissed the Second Amended Complaint without leave to amend.

## STANDARD OF REVIEW

■ We review de novo the district court's order dismissing a case for failure to state a claim. *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 925 (9th Cir.1993), *cert. de-*

---

1. The allegedly false or misleading statements—including Syntex's 1991 annual report, press releases, and communications to securities analysts—were made during the period from October 1991 through May 26, 1992. In late November 1991, Syntex's stock price was $38–¼ per share. It rose to a peak of $54–1/8 in mid-January 1992. Following a May 26, 1992 press release, the stock fell from $43–⅝ to $35–⅜ per share.

nied, — U.S. —, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). All allegations of material fact are taken as true and construed in the light most favorable to Plaintiffs. *Id.* However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir.1993). When deciding a motion to dismiss, a court may consider the complaint and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994).

## I

## DEFENDANTS' LIABILITY FOR THEIR OWN STATEMENTS

▮▮▮ Plaintiffs claim that Defendants misled investors by making optimistic statements about Syntex's future, thus violating section 10(b) of the Securities Exchange Act of 1934. Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device." 15 U.S.C. § 78j(b) (1988). Rule 10b–5 issued thereunder makes it unlawful, in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5(b).

Optimistic statements may constitute a basis for a claim under section 10(b). *Warshaw v. Xoma Corp.*, 74 F.3d, 955, 959 (9th Cir.

1996); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113–14 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). However, the fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made. *VeriFone*, 11 F.3d at 871. Whether a statement is misleading and whether adverse facts were adequately disclosed are generally questions that should be left to the trier of fact. *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" *Id.* (quoting *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987)).

## RECENT CASE LAW

There are several cases in this circuit addressing 12(b)(6) dismissals of actions involving securities fraud. We will examine several individually before applying the law to the facts of our case.

In *In re Lyondell Petrochemical Co. Sec. Litig.*, 984 F.2d 1050 (9th Cir.1993), the plaintiffs claimed that the company falsely represented that Lyondell would continue to operate profitably, when its internal projections indicated a decrease in revenues. *Id.* at 1051. The court held that Lyondell did not have a duty to disclose its internal projections. The court explained that "[t]he outcome of the present case would be entirely different had [p]laintiffs alleged Lyondell's internal predictions were based on existing negative factors known only to the company." *Id.* at 1053.

In *VeriFone*, this court considered a securities fraud action in which shareholders alleged that the defendant company failed to disclose declines in sales and projected changes in the company's product market.[2]

---

2. The plaintiffs in *VeriFone* complained of the following undisclosed facts:

—Sales growth to VeriFone's core market segment had slowed substantially.

The court held that the allegations merely accused VeriFone of failing to make forecasts on future events and that this failure was not actionable. 11 F.3d at 869. The court reasoned that "[a]bsent allegations that VeriFone withheld financial data or other existing facts from which forecasts are typically derived, the alleged omissions are not of material, actual facts." *Id. See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir.1994) (securities laws do not insure against stock downturns and known market risks; "investors took a gamble"), *cert. denied*, —— U.S. ——, 116 S.Ct. 185, 133 L.Ed.2d 123, *and cert. denied*, —— U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995).

In two cases decided since the instant case was argued, this court reversed 12(b)(6) dismissals of cases involving fraud on the market. In *Fecht*, company officials had made statements that the company's expansion of its retail warehouse operations was successful and that the expansion increased the company's prospects for earnings. 70 F.3d at 1080. The plaintiffs alleged that at the time that statement was made, the company knew that specific problems existed and that the expansion program was actually failing.[3]

The *Fecht* defendants argued that their statements were not misleading because they "bespoke caution." Specifically, they argued that the company had included an acknowledgment in a report to shareholders that the company "feel[s] a little more optimistic about our near-term future than [it] did at the end of the last quarter." In another report, the company warned that "[e]arnings may not increase at as high a rate as sales because of the ... operating costs associated with opening new Price Clubs." *Id.* at 1081. The court rejected defendants' argument, finding that these mildly cautionary statements "not only d[id] not cure, but arguably contribute[d] to the alleged misconception that the new stores were increasing the [c]ompany's profitability because it assume[d] an increase in earnings and focuse[d] only on the rate of that increase." *Id.* Thus, the court concluded that "the mix of information contained in the public documents issued by the [c]ompany d[id] not clearly preclude 'reasonable minds' from differing on the question of whether they included misleading statements." *Id.*

The *Fecht* court also found that the complaint complied with the requirements of Rule 9(b) as clarified by the en banc panel in *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541 (9th Cir.1994). Specifically, the court found that:

> plaintiffs cite specific problems with the expansion program: unsatisfactory initial sales volumes at the new stores and losses at specifically identified stores. For purposes of Rule 9(b), allegations of specific problems undermining a defendant's optimistic claims suffice to explain *how* the claims are false.

70 F.3d at 1083 (citing *GlenFed*, 42 F.3d at 1551). Accordingly, the court in *Fecht* reversed the district court's dismissal of the action.

In *Xoma*, the court followed *Fecht* and found that the complaint could not be dismissed under Rule 12(b)(6). In that case, the company, whose financial success depended on FDA approval of the drug E5, made repeated assurances that FDA approval was "imminent." 74 F.3d at 957. The company continued to make such assurances even after clinical studies revealed that E5 might not work and indicated that E5 would never be approved by the FDA. The court

---

—Unit sales had materially declined and were projected to show little, if any, growth for fiscal year 1990.

—VeriFone's historical sales channels were showing little growth in potential revenue.

—VeriFone's direct marketing sales force had no reasonable basis to predict VeriFone's ability to sell its product in these new markets.

—VeriFone's market was saturated, and VeriFone's sales would plummet unless VeriFone was able to convince customers in this market to upgrade.

—Revenue growth for the next few quarters was dependent upon the potential sales. 11 F.3d at 869.

3. The company was experiencing specific problems such as: consistent losses in almost all of its new stores; sales in the new stores were well below levels usually experienced in new stores and well below the level needed to achieve profitable operations; and the expansion program was being implemented too rapidly without adequate feasibility studies. 70 F.3d at 1081 n. 2.

found that the company had not "adequately qualified its optimism about E5 approval so as to find safe harbor under the 'bespeaks caution' doctrine." *Id.* at 959. The court stated that although the company "declined to speculate over FDA approval," and its SEC filings disclaimed "in general terms, the risks of failure involved in the FDA process," these cautionary statements were not sufficient to support a determination as a matter of law that defendants' statements were not misleading. The court held that "only if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Id.* (citation and internal quotation marks omitted).

Then, more recently, came *In re Stac Electronics Sec. Litig.*, 82 F.3d 1480 (9th Cir. 1996), which the court decided the other way—affirming the dismissal of a securities fraud action. In *Stac*, shareholders brought suit against a computer company for allegedly misleading statements and omissions about the company's prominent product, a data compression software program. The complaint alleged, among other things, that Stac went public knowing, but without disclosing, that Microsoft was about to come out with a competitive product. *Id.* at 1486. Upon examining the company's prospectus, however, the court found that the company made detailed disclosures concerning the risks of competition. For example, the prospectus specifically stated that one developer had already licensed a competitive data compression product, and that "[t]here can be no assurance that Microsoft ... will not incorporate a competitive data compression technology in their products." *Id.* at 1488.

The plaintiffs contended that this disclosure was inadequate because Stac *knew* that Microsoft was going to come out with a competitive product, "but masked this knowledge as a contingency." *Id.* However, the court found that unlike the plaintiffs in *Xoma*, the plaintiffs in *Stac* had not alleged contradictory statements, and that Stac's prospectus contained multiple warnings about the competitive nature of the computer industry. The court explained that even assuming that Microsoft had informed Stac that it planned

to introduce a competitive product, Stac could not have known whether Microsoft would actually do so. Furthermore, the court emphasized that the market knew of the risks of competition and of the potential for Microsoft's inclusion of the data compression technology. Finally, the court pointed out that "a company is not required to forecast future events or to caution that 'future prospects [may not be] as bright as past performance.' " *Id.* at 1489 (quoting *Worlds of Wonder*, 35 F.3d at 1420) (alteration in original).

The plaintiffs in *Stac* also argued that the company's prospectus misled investors about the company's return policy by stating that "the Company believes that it provides adequate allowances for returns." However, the actual statement in the Prospectus, when examined in full, reads: "Although the Company believes it provides adequate allowances for returns, *there can be no assurance* that actual returns in excess of recorded allowances will not result in a material adverse effect on business, operating results and financial condition." *Id.* at 1490 (emphasis added). Thus, the court concluded:

> Analyzing the quoted statements in context leads to the inexorable conclusion that investors were specifically and adequately cautioned about the relevant risks. Insofar as Stac's alleged misstatements can be viewed as "optimistic projections," they are more than adequately covered by the bespeaks caution doctrine.

*Id.* at 1491. As a result of the cautionary language and the disclosures in Stac's prospectus, the court held that "reasonable minds could not disagree that the challenged statements were not misleading." *Id.* (quoting *Fecht*, 70 F.3d at 1082).

## DISCUSSION

In order to apply this abundance of recent case law to the multiplicity of allegations in the 103 page Complaint, we have grouped the challenged statements made by Defendants into three areas: 1) the impact of the consent decree with the FDA involving Naprosyn advertising; 2) FDA approval of Over-the-Counter Naprosyn; and 3) the potential success of Syntex's new products.

## A. Consent Decree

■ In October 1991, Syntex entered into a consent decree with the FDA because Syntex had falsely promoted Naprosyn as a drug that arrested and prevented joint degeneration, rather than simply as a drug that relieved arthritis symptoms. The consent decree required the Company to spend $2 million to correct the advertising and to submit all advertising materials to the FDA for two years.

In the Complaint, Plaintiffs allege that Defendants misrepresented that the consent decree "should not have a material adverse effect on the results of operations" in the fiscal year ending July 31, 1992. However, in making this allegation, the Plaintiffs quoted only part of the passage from the 1991 Annual Report. This was similar to the inadequate complaint in *Stac,* which quoted an allegedly misleading statement about the company's return policy, but failed to include the remainder of the passage which contained "no assurance" language that warned of potential risks. *See Stac,* 82 F.3d at 1490.

Here, the 1991 Annual Report on which the allegation is based more completely stated:

> *Although the outcome cannot be predicted with certainty, it is the opinion of management,* based on advice of counsel, including counsel advising Syntex on FDA matters, and other considerations, that this matter should not have a *material* adverse effect on the results of operations in the current fiscal year ending July 31, 1992. (emphasis added)

When viewing this challenged statement in context, we can dispose of Plaintiffs' allegations about the consent decree on three grounds.

First, Defendants' statements constituted forecasts and predictions inactionable under *VeriFone.* The statement in the 1991 Annual Report about the effect of the consent decree on future sales for fiscal year 1992, was nothing more than a forecast on future sales and profits. This was precisely the type of statement held inactionable under *VeriFone,* and the company had no duty to warn that future prospects may not be as bright as past performance. *See Stac,* 82 F.3d at 1489; *Worlds of Wonder,* 35 F.3d at 1420; *VeriFone,* 11 F.3d at 869.

Second, Plaintiffs have not pleaded that this statement was false when made as required by Rule 9(b). *GlenFed,* 42 F.3d at 1547–49; *Stac,* 82 F.3d at 1487. The consent decree was filed on October 10, 1991. The 1991 Annual Report was distributed to shareholders on October 28, 1991, before the company had any way of knowing the precise impact of the consent decree on sales, whether physicians would react unfavorably, etc. Thus, Plaintiffs' argument that Defendants' statements about the consent decree were misleading because the consent decree negatively affected Syntex's sales by inhibiting Syntex's marketing and promotional abilities and angering physicians fails. Regardless of whether these negative effects later occurred, such results do not reflect on the accuracy of Defendants' predictions as stated in the 1991 Annual Report. Plaintiffs have not pled facts indicating that Defendants had inside knowledge that contradicted their public statement. Syntex revealed the existence of, reasons for, and facts about the consent decree. Any problems resulting from the consent decree would have become evident only with the passage of time and as sales data developed. Defendants' forward looking statement about the consent decree may have proved to be wrong, but Plaintiffs have not pled facts indicating that the statement about the consent decree was false *when made. See VeriFone,* 11 F.3d at 871 (the fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made); *GlenFed,* 42 F.3d at 1549 (plaintiffs must show that difference between earlier and later statements is "not merely the difference between two permissible judgments, but rather the result of a falsehood").

Third, Syntex's statement in the 1991 Annual Report "bespoke caution." Viewing the statement in full and in context at the time it was made, Defendants expressly acknowledged that the precise effect of the consent decree could not be known and that the company was merely stating its opinion that the consent decree would not have any "material adverse effect." Thus, no reasonable

mind could have been misled to believe that the company could accurately predict the impact of the consent decree on future sales or that the statement reflected anything more than a speculative opinion. *See Stac,* 82 F.3d at 1490–91 (no assurance language "bespoke caution"; "reasonable minds could not disagree that the challenged statements were not misleading").

■ Plaintiffs also seek to impose liability on Defendants for omitting facts about the consent decree found in Defendants' internal memoranda. Specifically, Plaintiffs allege that internal documents between February and April 1992 indicated that the consent decree was having a materially adverse effect on Naprosyn sales. Plaintiffs quote internal memoranda as stating: "clearly Lodine and the consent decree have impacted our ability to continue to grow volume at previous rates"; "clearly the consent decree and new product launches have affected Naprosyn's performance"; and "the consent decree and the promotional climate continue to curtail marketing efforts." However, the challenged internal memoranda were written months after the statement in the 1991 Annual Report was made, and after sales data developed and was processed by the company. At most, these memoranda could indicate that Syntex's predictions about the impact of the consent decree were inaccurate. They do not indicate that the challenged statement was false when made.[4]

Finally, it is worth noting that the statement about the consent decree did not turn out to be false when viewed in terms of comparisons between sales in fiscal years 1991 and 1992. As emphasized by the district court, the sales figures revealed that Naprosyn sales increased by $94.5 million, or 14%, during the fiscal year ending July 31, 1992. Thus, at least to that extent, Syntex's statement about the consent decree proved to be accurate.

### B. Statements about FDA approval of OTC Naprosyn

■ In January 1992, approximately two years before prescription Naprosyn's patent expired, Defendants predicted that over-the-counter Naprosyn would be approved "well in advance of" the 1993 patent expiration. Plaintiffs allege that this statement was misleading because Syntex knew that there were deficiencies in its testing procedures for the OTC drug such as problems with dosages and differences between the drugs tested (which lacked sodium) and the OTC version of Naprosyn (which contained sodium). This claim fails on similar grounds as the statement about the consent decree: this was a forecast, and Plaintiffs did not plead facts showing that the statement was false when made as required under Rule 9(b).

In estimating a date for FDA approval of OTC Naprosyn, Syntex was making a prediction far in advance, while the drug was still in the testing stage, about an approval decision that lies in the hands of a regulatory body. Thus, Syntex was forecasting a future event. Any alleged deficiencies in the testing procedures do not indicate that Syntex's prediction of an FDA approval date was false when made. Instead, the company could have known of problems in the testing procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval by the estimated date. Clearly, Defendants' prediction of a date for a regulatory decision over which they did not have control, made that far in advance, for a drug that was still in the testing stages, could not carry a guarantee of accuracy or reliability.

This is distinguishable from *Xoma,* where the company stated that approval of E5 was imminent, when it knew that approval was unlikely. 74 F.3d at 957–59. Nothing in this case indicates that the company had knowledge contradicting its ability to achieve FDA approval within two years and prior to the expiration of prescription Naprosyn's patent. This conclusion is supported by the fact that, as it turned out, the FDA did actually issue its approval for OTC Naprosyn only three weeks after the patent expiration on prescription Naprosyn. Apparently the company was able to remedy any defects in the

---

4. Syntex's sales data were available on a quarterly basis, and prescription rates were available on a monthly basis. Thus, as soon as the data developed, the market also had knowledge of any decline in sales that may have followed the consent decree.

testing procedures and in the drug itself. This indicates that the statement was not false when made, and it was not materially misleading. *See In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 514 (9th Cir. 1991) (finding sales estimates that proved inaccurate by approximately 10% were not actionable especially in light of other estimates which underestimated another quarter's revenues).

In sum, Defendants' statements about FDA approval of OTC Naprosyn were inactionable forecasts, and Plaintiffs have not pled facts showing that the statements were false when made. Thus, claims related to these statements fail under *VeriFone*, 11 F.3d at 869, and *GlenFed*, 42 F.3d at 1551.

*C. Statements about future success of New Products*

■ Plaintiffs allege that Defendants misrepresented that its new products-Oral Toradol, Ticlid and OTC Naprosyn-would offset any declining profits due to the Naprosyn patent expiration. Specifically, Plaintiffs allege that Defendants misled the market with statements such as the following:

*October 31, 1991 Press Release:*

[T]he company has received permission from the ... [FDA] to market Ticlid....

. . . .

Ticlid has the potential to play an important role in alleviating human suffering and death....

. . . .

... Ticlid significantly reduced the risk of stroke compared to aspirin.[5]

*November 25, 1991 Press Release:*

[Syntex] expects double-digit percentage growth in earnings per share for the full 1992 fiscal year.

. . . .

... Our current high level of profitability and financial strength provides us with the basis for making sound investments in marketing and research now to enhance profitability in the future.... Such activities are key elements of our strategic plan to bring new products to the market in a timely way in light of the December 1993 expiration of the United States patent for Naprosyn....

. . . .

... We currently expect the second half of fiscal 1992 to be much stronger than the first half of the year.

*December 20, 1991 Press Release:*

[Injectible Toradol] has been exceptionally well-accepted by physicians....

. . . .

... [Syntex] expects Toradol Oral to make an important contribution to Syntex's future sales and results.[6]

*January 10, 1992 Conference and Press Release:*

We're a company on the move. We're doing well and I think we have a great future.

Business will be good this year.... We expect the second half of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger than the first, because we are incurring expenses in connection with new product introductions, including our expanded sales force, before we have the full benefit of new product sales.

. . . .

Based on strong demand for our innovative, cost-effective newer products and our rich product pipeline, we believe we can achieve our goal of sales and earnings growth in the top 50 percent of the industry during the decade of the 1990's....

Ticlid is the first prescription anti-platelet agent to be approved for marketing in the United States.

---

**5.** The Complaint, however, does not reveal that the Press Release also stated:

> Because Ticlid is associated with a risk of neutropenia/agranulocytosis, which may be life-threatening, Ticlid should be reserved for patients who are intolerant to aspirin therapy....
>
> . . . .

**6.** However the Complaint fails to state that the December press release also pointed out the risks associated with Oral Toradol and stated that it "is not recommended for long-term use in patients with chronic painful conditions."

... The [stage] we are in right now, is a very rich phase. Everything is clicking. New products are coming in a wave, not in a trickle. Old products are doing very well....

. . . .

With the recent U.S. product introductions ... I am indeed optimistic about Syntex's performance during this decade....[7]

On May 26, 1992, Syntex revealed that its third quarter fiscal 1992 earnings-per-share had declined from the prior quarter, that Ticlid's operations had declined, and that Ticlid's acceptance was "moving slowly." Ticlid's first report of comparative sales figures for Ticlid revealed that sales of Ticlid fell by over 60% in the third quarter, ending April 30, 1992, as compared to the quarter ending January 31, 1992, when Ticlid was first shipped. Plaintiffs claim that this shows that Ticlid's forecasted earnings were "unrealistic."

Plaintiffs assert that despite the decline in operating revenue and disappointing sales of Ticlid, Syntex's press release contained more misleading representations.

*May 26, 1992 Press Release* [8]:

Our sales increase in the third quarter of fiscal 1992 [as compared to the third quarter of fiscal 1991] was due primarily to the excellent worldwide performance of Toradol ... and to increased sales of Naprosyn.

. . . .

We are delighted with the rapid acceptance of the oral formulation of Toradol....

. . . .

We expect Ticlid to perform well over time....

According to Plaintiffs, Defendants' representations regarding Syntex's financial forecasts and new products' success were false and misleading because they omitted material facts such as:

—Syntex's sales were down and Defendants knew its old products, especially Naprosyn were not doing well.

—Ticlid had a much smaller potential market than estimated, and it was not off to a good start.

—Syntex automatically sent the initial shipments of Ticlid to its wholesalers pursuant to agreements, not in response to end user demand.

—Physicians were very reluctant to prescribe Ticlid or use it as first line therapy because doctors perceived Ticlid as having no significant benefits not already provided by safer and less expensive products like ordinary aspirin.

—Physicians had not readily accepted Oral Toradol because they did not perceive it as providing more benefits than less expensive pain relievers.

—Oral Toradol treated pain similar to that treated by Naprosyn, which meant that Oral Toradol sales would cannibalize sales of Naprosyn.

After carefully sorting through the challenged statements in light of when they were made and in conjunction with other statements made in the same documents from which the challenged statements came, we conclude that again Plaintiffs fail to state a claim because: 1) the statements constituted inactionable forecasts; and 2) Plaintiffs have not pled facts showing that the statements were false when made.[9]

7. The Complaint omitted that the press release also stated that when Defendant Freiman, the Chief Executive Officer of Syntex, was asked about analysts' predictions regarding future earnings per share, Mr. Freiman stated, "We don't forecast earnings," and emphasized that investors should not attribute such estimates to Syntex.

8. This is the last statement of Defendants that we consider for purposes of this action because, as explained in Part III of this Opinion, the district court correctly determined that Plaintiffs' at-

tempt to amend the Complaint to include claims of new class members (purchasers of Syntex stock between May 27 and August 6, 1992) were time-barred. Thus, Defendants' statements made after the May 26th date are irrelevant to this action.

9. Many of the allegations in the 103 page Complaint were stated (and repeated) in general terms. However, the challenged statements must be examined in light of when they were made, what knowledge the company had at that particular time, who made the statement, etc.

First, we must emphasize that the challenged statements must be viewed in context. This case involves the situation where shareholders invest in an industry that is laden with risk. The drug manufacturing industry is similar to the computer industry as seen in *Stac*, where companies are faced with high levels of competition, patent issues, and dangers of obsolescence. Drug companies are also subject to the influence of other unpredictable forces because their business is highly regulated.

Here, Syntex made optimistic statements about the potential success of new products. However, these were new and innovative drugs: Ticlid was the "first prescription anti-platelet agent" of its kind in the United States; Toradol was the "only nonsteroidal anti-inflammatory ... analgesic available in both injectible and oral formulations." Any statements related to future sales of new products were merely forecasts, optimistic speculations as to how the market would react to the new products. *See VeriFone*, 11 F.3d at 869. Defendants did not "[withhold] financial data or other existing facts from which forecasts are typically derived." *See VeriFone*, 11 F.3d at 869.

This case is distinguishable from the claims that survived motions to dismiss in *Fecht*, where the company had misrepresented the success of its expansion program; and in *Xoma*, where the company said FDA approval was imminent when it knew it was not. As alleged in those complaints, at the time the defendants made optimistic statements they already had knowledge of contradictory facts and information that they did not disclose to investors.

Here, Defendants optimistically forecasted future sales of their new and innovative drugs. They made these forecasts based on extensive testing, development, and market research. Defendants openly revealed that they were spending a great deal of money marketing their new products and expanding their sales forces, and that they expected those expenses to be recovered during later quarters when the new products began to produce revenue. They expressly stated the company's success depended on the performance of the new products. They disclosed negative factors such as Ticlid's competition with less expensive aspirin, that Toradol was not appropriate for long-term use, and potential problems with the new drugs' side-effects.

And, as soon as the new products reached the market and sales information was available, Defendants revealed that information to the market. The company's sales data were available on a quarterly basis.[10] In light of the first quarterly sales data developed after Ticlid was introduced, the company publicly acknowledged that Ticlid was "moving slowly," and attributed the slow growth to the fact that physicians lacked awareness about the drug. Also, the market knew prescription rates, which were reported by an independent survey company, on a monthly basis.

We further note that Defendants' general statements of optimism were curtailed by general uncertainty in the market based on the common knowledge that Syntex's patent on prescription Naprosyn, its flagship product, was to expire in December 1993. As early as December 1991, the market was acknowledging the risks of competition from outsiders who were also developing drugs to treat arthritis. This is similar to the situa-

Plaintiffs make this an almost impossible task by repeating general allegations, mixing together allegations about Defendants' statements and analysts' statements, and omitting pertinent parts of the challenged statements. We note that this litigation tactic, which makes it difficult for courts to sort through and determine the merits of a claim, affronts Rule 8's mandate of a "short and plain statement of the claim." *See* F.R. Civ. P. 8.

**10.** Ticlid was first distributed in December 1991. As is the case with most new products, the market knew that the first distributions of the Ticlid

would be "automatically sent" to wholesalers to be ready for sale. Ticlid's sales data were reported following the quarters ending January 31, 1992 and April 30, 1992. Although the company may have made optimistic statements in January about Ticlid, the product was brand new to the market. An analyst in January noted that, "Ticlid is off to a good start ... *but the evidence is only anecdotal so far.*" (emphasis added)

Oral Toradol was not introduced until early 1992, and its sales were first reported for the quarter ending April 30, 1992, the first quarter it was on the market.

tion in *Stac* where the court found that the market knew Microsoft might include data compression technology in one of its products. *Stac,* 82 F.3d at 1489.

Thus, we conclude that the challenged statements constituted inactionable forecasts about future profits similar to the claims in *Lyondell, VeriFone,* and *Stac.* Plaintiffs have not shown that Defendants' had inside knowledge indicating that their statements were false when made as required under Rule 9(b). Instead, they have only shown that predictions made about innovative drugs in a highly competitive and rapidly changing industry proved to be inaccurate. Because Defendants' predictions proved to be wrong in hindsight does not render the statements untrue when made. *See VeriFone,* 11 F.3d at 871 (the fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made); *GlenFed,* 42 F.3d at 1549 (plaintiffs must show that difference between earlier and later statements is "not merely the difference between two permissible judgments, but rather the result of a falsehood"). The challenged statements were nothing more than inactionable forecasts, and they do not give rise to a securities fraud claim. *See Stac,* 82 F.3d at 1489; *Worlds of Wonder,* 35 F.3d at 1420; *VeriFone,* 11 F.3d at 869.

## II

### DEFENDANTS' LIABILITY FOR ANALYSTS' STATEMENTS

Many of Plaintiffs' allegations are based on statements made by analysts. Plaintiffs claim that Defendants are responsible for these statements and reports, which misled the market and artificially inflated the value of Syntex stock. For example, Plaintiffs allege that in November 1991 various analyst reports predicted high sales in 1992, stating: "We believe that Ticlid will be that strong seller ... oral toradol could possibly be a blockbuster"; "We believe that oral toradol has even greater sales potential than Ticlid." Following the January 1992 conference, analysts reported that "the company views the Toradol family ... as having greater sales potential than Naprosyn, whose revenues will

exceed $1 billion this year"; "Ticlid is off to a good start"; "Syntex estimates the total [Ticlid] market at 3.5 million patients"; "The only risk could be erosion on [sic] Naprosyn's market share due to competition, but the new product outlook more than offsets [this] consideration in our view"; etc. Plaintiffs contend that Defendants "lied" to securities analysts who, in turn, misled the public by repeating Defendants' representations.

■ "In order to be liable for unreasonably disclosed third-party forecasts, defendants must have put their imprimatur, express or implied, on the projections." *Stac,* 82 F.3d at 1492 (quoting *In re VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1486 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir.1993)). Also, the Complaint must state particular facts as required by Rule 9(b). *Id. See also In re Caere Corporate Sec. Litig.,* 837 F.Supp. 1054, 1059 (N.D.Cal.1993) (adoption occurs when a defendant "sufficiently entangled himself with the analysts' forecasts"; "[there are] sound reasons to construe the entanglement requirement strictly").

■ Here, Defendants never endorsed or adopted the statements of analysts; they never put their "imprimatur on the projections." Instead, these statements were the culmination of a one-way flow of information, from Syntex representatives to analysts and from the analysts to their customers. In fact, when Defendant Freiman (Syntex's CEO) was asked about the analysts' predictions related to future earnings per share, Freiman stated, "We don't forecast earnings," and emphasized that such estimates should not be attributed to Syntex. Thus, Syntex did not adopt or entangle itself in the analysts' statements.

Accordingly, Plaintiffs have failed to state a claim for liability based on analysts' statements.

## III

### EXTENSION OF THE CLASS PERIOD

■ Plaintiffs' First Amended Complaint was filed on November 13, 1992. In their Second Amended Complaint, Plaintiffs attempted to extend the Class Period from

May 26, 1992 to August 6, 1992. The district court found that because the allegations concerning the extended period in the Second Amended Complaint were substantively the same as the allegations in the First Amended Complaint, the Plaintiffs "discovered" the facts underlying their claims by the time the First Amended Complaint was filed. Because the new claims were not filed until November 30, 1993, the court barred all but the new claims related to the FDA approval of OTC Naprosyn (the facts about FDA approval were not discovered until later).[11]

The applicable section of the securities law that provides this limitation states that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e); *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 n. 9, 111 S.Ct. 2773, 2782 n. 9, 115 L.Ed.2d 321 (1991).

The plaintiffs in *Stac* similarly attempted to extend the limitations period. 82 F.3d at 1492. There, the plaintiffs filed a second amended complaint one year and four months after the original complaint was filed, naming for the first time nine new defendants. The plaintiffs claimed that they did not have enough information earlier to suspect the involvement of the new defendants. The court found that the new claims were barred by the one year statute of limitations, explaining:

> Given, however, that plaintiffs were clearly aware of or suspected fraud at the time they filed their first complaint, and given further that all of the new defendants were named in the Prospectus and added to the [Second Amended Complaint] on the basis of their corporate positions alone, the district court correctly found that plaintiffs had adequate notice.

*Id.*

Here, we similarly find that Plaintiffs had "discovered" the facts underlying their secu-

rities claims, and that the statute began to run when Plaintiffs filed their First Amended Complaint. In the First Amended Complaint, filed November 13, 1992, Plaintiffs defined the Class as purchasers of Syntex's stock between November 25, 1991 and May 26, 1992. That complaint, however, specifically refers to Defendants' and analysts' statements in June, July, and August of 1992, and to the corresponding decline in Syntex's stock. Thus, Plaintiffs had "discovered" the facts related to any potential claims (i.e., purchasers of stock after the May 26, 1992 date) by the time the First Amended Complaint was filed. Accordingly, we find that Plaintiffs had actual notice of the violations when the First Amended Complaint was filed and that the statute of limitations began to run at that time.

 We also disagree with Plaintiffs' alternate argument that the claims relate back to the claims in the First Amended Complaint. An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff. *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1278–79 (9th Cir.1982). Here, Plaintiffs did not show that the two groups of plaintiffs had an identity of interests. The claims of the proposed plaintiffs are different because the newly proposed class members bought stock at different values and after different disclosures and statements were made by Defendants and analysts. Therefore, Plaintiffs from the original class period would have different interests than those who bought stock after May 26, 1992.[12] Accordingly, the proposed new claims did not relate back.

 Plaintiffs' argument that the commencement of a class action suit satisfies the statute of limitations for all those who might

---

11. However, for the reasons stated in Part I.B. above, the claims related to optimistic predictions about the date of FDA approval for OTC Naprosyn were not actionable.

12. On May 26, 1992, Defendants had revealed that Ticlid was moving slowly and had pointed out some other problems that the company was experiencing.

subsequently participate in the suit also fails. The equitable tolling doctrine only tolls the statute of limitations for asserted class members. *See Sawtell v. E.I. du Pont de Nemours & Co., Inc.,* 22 F.3d 248, 253 (10th Cir.) (statute of limitations was not tolled because proposed plaintiff was a New Mexico resident and the class action had been brought on behalf of Minnesota residents only), *cert. denied,* —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). Here, the new Plaintiffs were not "asserted class members." Instead, the proposed plaintiffs wanted to expand the class in order to become class members. Thus, we hold that Plaintiffs' claims extending the class period beyond May 26, 1992, as filed in the Second Amended Complaint, were barred by the statute of limitations.

**AFFIRMED.**